IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

LILLY B. BRYANT,

      Plaintiff,

v.                                   CASE NO. 2:05-cv-00297

JO ANNE BARNHART,
Commissioner of Social Security,

      Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

    This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the court are Plaintiff's Motion for Summary Judgment and Defendant's Motion for Judgment on the Pleadings.

    Plaintiff, Lilly Bell Bryant (hereinafter referred to as "Claimant"), protectively filed an application for SSI on January 7, 2003, alleging disability as of June 13, 2000, due to a back injury, a nervous condition and a foot impairment.  (Tr. at 61-63, 80.)  The claim was denied initially and upon reconsideration.

(Tr. at 41-45, 48-50.)  On December 15, 2003, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 51.) The hearing was held on August 19, 2004, before the Honorable Theodore Burock.  (Tr. at 372-408.)  By decision dated November 24, 2004, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 11-21.)  The ALJ's decision became the final decision of the Commissioner on February 16, 2005, when the Appeals Council denied Claimant's request for review.  (Tr. at 4-6.)  On April 11, 2005, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2004).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently

engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2004).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant

satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 12.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of chronic lumbar and cervical strains, depression, anxiety and foot problems. (Tr. at 15.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 15.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 18.) Claimant has no past relevant work. (Tr. at 18.) The ALJ concluded that Claimant could perform jobs such as garment sorter and packager of small merchandise, which exist in significant numbers in the national economy. (Tr. at 20.) On this basis, benefits were denied. (Tr. at 21.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).
Additionally, the Commissioner, not the court, is charged with
resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d
1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not
abdicate their traditional functions; they cannot escape their duty
to scrutinize the record as a whole to determine whether the
conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d
396, 397 (4th Cir. 1974).

    A careful review of the record reveals the decision of the
Commissioner is not supported by substantial evidence.

Claimant's Background

    Claimant was fifty-three years old at the time of the
administrative hearing.  (Tr. at 376.)  Claimant dropped out of
school in the ninth grade and testified that she could read and
write simple sentences. (Tr. at 378-79.)  Claimant was a homemaker
and has no past relevant work as that term is defined in the
regulations at 20 C.F.R. § 416.965 (2004).  (Tr. at 381.)

The Medical Record

    The court has reviewed all evidence of record, including the
medical evidence of record, and will summarize it briefly below.

    The record includes certain school records, including
Claimant's grades from the seventh, eighth and ninth grade.
Claimant received Cs, Ds and Fs.  Claimant's school records also
include the results of certain standardized tests.  (Tr. at 73.)

The record includes treatment notes from Roger Baisas, M.D. dated July 17, 2000, through October 13, 2002, for Claimant's complaints of back and neck pain and left leg pain.  (Tr. at 122-26.)  On July 17, 2000, Dr. Biasas noted Claimant's complaints of back and neck pain.  He recommended physical therapy.  (Tr. at 126.)  On August 14, 2000, Claimant reported doing a little better.  Dr. Biasas diagnosed lumbar radiculitis and cervicalgia.  (Tr. at 125.)  On September 11, 2000, Claimant reported her condition was up and down, sometimes good and sometimes bad.  (Tr. at 124.)  On November 2, 2000, Claimant stated that her low back hurt more than her neck. She did not want to go to a pain clinic.  Dr. Biasas noted he had nothing more to offer Claimant and suggested a referral to a neurosurgeon.  (Tr. at 123.)  On October 13, 2000, Claimant reported she was not as anxious as she was before.  Dr. Biasas spoke with Claimant about pain management versus referral to a neurosurgeon.  Claimant was undecided.  (Tr. at 122.)

A State agency medical source completed a Physical Residual Functional Capacity Assessment on March 19, 2003, and opined that Claimant was limited to light level work, reduced by an occasional ability to climb and balance and a need to avoid concentrated exposure to vibration and hazards.  (Tr. at 130-37.)

On June 17, 2003, John B. Koch, M.A. examined Claimant at the request of the State disability determination service.  (Tr. at 139-43.)  Claimant reported applying for benefits because of her

6

nerves and stated she had panic attacks several times per week. (Tr. at 139.)  Claimant reported dropping out of school in the ninth grade.  She stated that she was able to acquire basic skills in school without difficulty and denied any special education placement or grade repetition.  (Tr. at 141.)  Claimant was oriented times three.  Her mood was sad.  Her judgment was within normal limits.  Her immediate memory was moderately deficient, her recent memory was severely deficient and her remote memory was within normal limits.  Claimant's concentration was mildly deficient, and her pace was mildly slow.  Claimant reported doing some household chores and watching television during the day. Claimant does no shopping or housework.  (Tr. at 142.)  Mr. Koch diagnosed a mood disorder due to chronic pain on Axis I and made no Axis II diagnosis.  (Tr. at 143.)

A State agency medical source completed a Psychiatric Review Technique form on July 2, 2003, and opined that Claimant's mental impairments were not severe.  (Tr. at 145-58.)

The record includes treatment notes from Harts Health Center dated February 17, 1993, through July 21, 2003.  (Tr. at 160-93.) The records indicate Claimant underwent a mammogram and a breast biopsy.  The breast biopsy was negative.  (Tr. at 160.)

On September 5, 2003, W. Joseph Wyatt, Ph.D. examined Claimant at the request of Claimant's counsel.  (Tr. at 194-99.)  Claimant reported a nervous condition since being diagnosed with cancer in

7

1986.  Claimant underwent a successful hysterectomy and has been cancer free for seventeen years.  (Tr. at 194.)  Claimant reported ongoing family strains.  (Tr. at 195.)  Dr. Wyatt noted that Claimant had a poor educational level and gave the impression of below average intellect.  (Tr. at 195.)  Claimant reported reading and writing "to an extent" and that she had done some bill paying early on in her marriage but that her husband took it over more recently.  Dr. Wyatt noted that standardized achievement tests showed Claimant possessed verbal skills in the lowest six percent of the population, quantitative skills in the lowest five percent and overall academic skills in the lowest four percent of the population.  (Tr. at 196.)  Claimant was depressed and somewhat anxious.  She was not suicidal or psychotic.  There was no history of hallucinations or delusions.  Claimant was oriented to person, place and time.  Her judgment and insight were poor.  (Tr. at 197.)  On the WAIS-III, Claimant attained a verbal IQ score of 60, a performance IQ score of 56 and a full scale IQ score of 54.  Dr. Wyatt indicated that the scores were valid.  Dr. Wyatt opined that with Claimant's school record and history, she was mildly mentally retarded.  (Tr. at 197-98.)  On the WRAT-III, Claimant scored on the third grade level for reading.  (Tr. at 198.)  Dr. Wyatt diagnosed major depressive disorder, recurrent, chronic, severe without psychotic features and panic disorder without agoraphobia on Axis I and mild mental retardation on Axis II.  (Tr. at 198.)

Dr. Wyatt opined that Claimant was totally disabled.  (Tr. at 199.)

Dr. Wyatt completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on September 5, 2003.  He opined that Claimant had poor to no ability in almost all areas.  (Tr. at 200-02.)

On September 5, 2003, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's mental impairments were not severe.  (Tr. at 206-19.)  It does not appear that the State agency medical source had access to Dr. Wyatt's report.

On November 11, 2003, a State agency medical source completed a Physical Residual Functional Capacity Assessment on which he opined that Claimant was capable of medium level work reduced by an occasional ability to climb ladders, ropes and scaffolds, crouch and kneel and a need to avoid concentrated exposure to extreme cold and vibration.  (Tr. at 226-32.)

Pathom Thavaradhara, M.D. examined Claimant at the request of the State disability determination service on October 16, 2003. (Tr. at 235-38.)  Dr. Thavaradhara's neurological examination was normal.  Claimant had normal lumbar lordosis, gait and posture. She had no swelling or redness, effusion or crepitation of the joints.  Dr. Thavaradhara opined that Claimant was not medically disabled and should be able to work as a housewife or in any other comparable job.  However, he stated that Claimant's "chances of

9

working are very slim due to limited skills and her back problem."
(Tr. at 237.)

The record includes treatment notes from Logan-Mingo Area
Mental Health, Inc. dated March 27, 2001, through November 12,
2003.  (Tr. at 241-62.)  On March 27, 2001, Claimant reported
chronic anxiety and depression.  Claimant was prescribed Paxil and
Ativan.  (Tr. at 262.)  On June 21, 2001, Claimant reported a lot
of stress, but was functioning.  (Tr. at 262.)  On December 20,
2001, Darlene Marcum, B.A., a case manager, noted Claimant was
cooperative and spoke in a normal tone with poor eye contact, but
good posture.  Claimant appeared to have average intelligence and
judgment.  Ms. Marcum rated Claimant's Global Assessment of
Functioning ("GAF") at 80.  (Tr. at 260.)  On December 20, 2001, I.
Ahmad, M.D. noted that Claimant reported bad nerves and a poor
appetite.  Claimant had good eye contract, her speech was normal
and she had no auditory or visual hallucinations.  Dr. Ahmad
prescribed Zoloft and Ativan.  (Tr. at 257.)  On January 21, 2002,
Claimant reported she did not want to take the Zoloft because it
made her nervous.  (Tr. at 256.)  On April 19, 2002, Claimant
reported to Dr. Ahmad that her back was bothering her and that her
nerves were "bad."  (Tr. at 255.)  Claimant was calm and
cooperative and had good eye contact.  Her speech was normal.  She
had no delusions.  (Tr. at 255.)

On July 19, 2002, Claimant reported a lot of stress.  Dr.

Ahmad diagnosed major depression, single episode. Claimant indicated she wanted to change doctors. (Tr. at 254.) On August 20, 2002, Claimant reported doing well with medication. (Tr. at 247.) On October 19, 2002, Claimant's GAF was rated at 80 by Ms. Marcum. (Tr. at 253.) On November 19, 2002, Claimant reported doing well with medication. (Tr. at 247.) On February 19, 2003, and again on May 18, 2003, another case manager rated Claimant's GAF at 80. (Tr. at 250-251.) On May 13, 2003, Dr. Ahmad noted that Claimant reported feeling ok as long as she took Xanax. Claimant reported good sleep and appetite. Dr. Ahmad diagnosed generalized anxiety disorder. (Tr. at 245.) On November 12, 2003, Ms. Marcum rated Claimant's GAF at 80. (Tr. at 243.) On August 12, 2003, Claimant reported to Dr. Ahmad that she was doing well. Her nerves were ok and she had good sleep and appetite habits. (Tr. at 242.) On November 12, 2003, Claimant reported to Dr. Ahmad that she was doing well. Claimant wanted an increase in her Xanax because she was stressed out. He started Claimant on a noncontrolled substance for anxiety and discussed dependency issues with Claimant. (Tr. at 241.)

The record includes emergency room records and other evidence from Logan Regional Medical Center dated November 19, 2001, through December 23, 2003. (Tr. at 263-318.) Claimant reported to the emergency room on September 30, 2002, October 1, 2002, October 11, 2002, November 19, 2001, December 20, 2001, December 12, 2002,

11

December 17, 2002, and March 21, 2003, complaining of back pain and
on at least one occasion, following a motor vehicle accident.  (Tr.
at 264, 268, 271, 280, 286, 292, 299, 306.)  X-rays of Claimant's
lumbar spine on December 20, 2001, were normal.  (Tr. at 318.)  A
lumbar spine series on September 30, 2002, showed some disc space
narrowing at L5-S1 and thoracolumbar scoliosis.  (Tr. at 317.)

The record includes treatment notes from Dan L. Johnson,
D.P.M. dated October 7, 2002, through December 30, 2003.  (Tr. at
319-36.)  In an undated letter, Dr. Johnson, a podiatric surgeon,
wrote that Claimant showed symptoms of nerve root compression
syndrome in L-4,5 S-1 area of the lumbar-sacral spine that resulted
in paresthesias, numbness, tingling and sharp stabbing pain down
the legs and radiating into the feet bilaterally.  Claimant also
experienced muscle spasms of the posterior leg and plantar foot
muscles.  Dr. Johnson stated that symptoms are aggravated by
standing and walking more than 30 feet at a time.  Dr. Johnson
opined that while analgesics and muscle relaxants provided some
relief, Claimant could not stand or walk for extended periods of
time without pain.  In addition, he felt Claimant should limit
walking and/or standing to 30 minutes at the upper limit, then rest
for 15 to 30 minutes.  (Tr. at 336.)  Dr. Johnson consistently
prescribed Vicodin and Soma Tabs and noted in his treatment notes
that Claimant's condition was stable.  (Tr. at 319-35.)  Claimant
generally indicated that with medication, her pain level improved

12

significantly.  (Tr. at 330-31.)

The record includes physical therapy treatment notes.  (Tr. at 337-57.)

By letter dated January 23, 2004, Joyce Goodman, a case manager at Logan Mingo Area Mental Health, wrote that Claimant had been treated there since September 10, 1992.  She noted Claimant's diagnosis of generalized anxiety disorder.  She explained that Claimant is treated by Dr. Ahmad, who prescribes Xanax, and that Claimant has been compliant with treatment and medications.  She stated that Claimant had remained stable with medication.  Ms. Goodman opined that Claimant

> would be a poor candidate for employment due to her symptoms of nervousness, crying episodes, low energy level, insomnia and irritability.  Lilly becomes agitated when confronted with people.  She reports that she is unable to make sound decisions.  Lilly reports that she tires out easily with little exertion.  In my opinion, as her case manager, Lilly would be unable to meet daily obligations of public employment.

(Tr. at 358.)

The record includes additional treatment notes from Logan Mingo Area Mental Health dated March 11, 2004 through June 11, 2004.  (Tr. at 361-71.)  On March 11, 2004, Fonda Adkins, M.A., L.S.W., Case Manager, rated Claimant's level of functioning ("LOF") at 65.  (Tr. at 371.)  On March 11, 2004, Claimant reported to Dr. Ahmad that she was hanging in there. She had stopped taking Zoloft because it made her more nervous.  Claimant requested that Dr. Ahmad switch her to Ativan.  (Tr. at 363.)  On June 11, 2004,

13

Claimant reported anxiety attacks. (Tr. at 364.) Ms. Adkins rated Claimant's LOF at 80. (Tr. at 366.) On September 11, 2004, Ms. Goodman rated Claimant's GAF at 82. (Tr. at 368.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ's finding that Claimant was not disabled is not supported by substantial evidence; (2) the ALJ erred in his pain and credibility analysis; (3) the ALJ exhibited bias against Claimant; (4) the ALJ's findings related to Claimant's education level are not supported by substantial evidence; and (5) the ALJ erred in considering the vocational testimony of record. (Pl.'s Br. at 3-6.)

The Commissioner argues that (1) substantial evidence supports the Commissioner's decision that Claimant could perform work in the local and national economy; (2) the ALJ properly assessed Claimant's subjective complaints; and (3) the ALJ properly considered the vocational expert's testimony. (Def.'s Br. at 5-8.)

The court finds it necessary to address only one of Claimant's arguments, as it provides grounds for a recommendation of remand. The remaining issues raised by Claimant can be addressed on remand. Specifically, Claimant argues that the ALJ erred in his findings related to Claimant's educational ability. Claimant asserts that she functions at a marginal level at best, rather than at a limited level as found by the ALJ. (Pl.'s Br. at 5-6.)

14

A marginal education is defined as "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  We generally consider that formal schooling at a 6th grade level or less is a marginal education." 20 C.F.R. § 416.964(b)(2) (2004).  Limited education is defined as "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs.  We generally consider that a 7th grade through the 11th grade level of formal education is a limited education."  20 C.F.R. § 416.964(b)(3).  As Claimant points out, "the numerical grade level that you completed in school may not represent your actual educational abilities.  These may be higher or lower. However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities." 20 C.F.R. § 416.964(b).

In his decision, the ALJ explained that he rejected the IQ test results from Dr. Wyatt because Claimant

> completed the ninth grade and was never placed in special
> education classes or had to repeat any grades.  The
> claimant reported she was able to acquire basic skills in
> school without any difficulty.  In Dr. Wyatt's opinion,
> the claimant's IQ's were the result of a combination of
> her depression and anxiety.  However, the record fails to
> show a level of anxiety or depression which would account
> for such a low level of cognitive functioning.  The
> treatment notes from the Logan Mingo Mental Health, the
> claimant's treating source, indicate claimant appeared to
> be of average intelligence (Exhibit 12-F).  Furthermore,
> no other medical source indicated that the claimant was

15

> functioning in the mild mental retardation range of
> intelligence. Dr. Wyatt opined that the claimant was not
> capable of handling her own finances.  However, the
> undersigned gives more weight to John Koch, M.A., who
> performed a consultative psychological evaluation and
> opined that the claimant is capable of managing her own
> finances (Exhibit 5-F).  The claimant can read and write
> and has even paid her own bills in the past.
> Additionally, Dr. Wyatt relied on the claimant's
> subjective complaints and she is not totally credible.
> The undersigned further rejects Dr. Wyatt's opinion that
> the claimant's GAF was rated at 40, because this is not
> supported by the claimant's treatment notes from her
> treating source, which ind[ic]ated her GAF was rated at
> 65 to 80 (Exhibit 12-F).

(Tr. at 13.)

The ALJ ultimately concluded that Claimant's residual functional capacity was reduced to light work, further reduced by nonexertional limitations including an ability to perform only routine, repetitive tasks with no public contact. (Tr. at 18.) In his decision, the ALJ found Claimant's educational level was "limited." (Tr. at 19.) In his hypothetical question, the ALJ also indicated that Claimant has a ninth grade education, "is literate" and "able to read and write short simple sentences." (Tr. at 402.)

The court proposes that the presiding District Judge find that the ALJ did not fully and adequately consider the evidence of record related to Claimant's level of intellectual functioning in the context of the applicable Listing.  In a related vein, the court further proposes that the presiding District Judge find that the ALJ's rejection of Dr. Wyatt's IQ scores is not supported by

16

substantial evidence.

In order to meet the criteria of Listing 12.05C, the regulations require that a claimant must meet the introductory language of Listing 12.05C, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Subpt. P, App. 1, § 12.05 (2004); see also § 12.00A (stating that for Listing 12.05, claimants must satisfy the diagnostic description in the introductory paragraph and any one of the four sets of criteria).  In addition, a claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function."    20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2004).

The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C.  Luckey v. Bowen, 890 F.2d 666 (4th Cir. 1989). A "severe" impairment is one "which significantly limits [one's] ability to do basic work activities." 20 C.F.R. § 416.920(c) (2004).  In Luckey, the Court ruled that

> Luckey's inability to perform his prior relevant work
> alone established the significant work-related limitation
> of function requirement of § 12.05C.  Further, the
> Secretary has defined a severe impairment or combination

17

of impairments as those which significantly limit an
individual's physical or mental ability to do basic work
activities. The Secretary's finding that Luckey suffers
from a severe combination of impairments also establishes
the second prong of § 12.05C.

Id. at 669.

Without ever mentioning Listing 12.05C, the ALJ rejected the
only IQ scores of record and the opinion of Dr. Wyatt for reasons
that, upon careful review, are not supported by substantial
evidence of record. In particular, the ALJ stated that it was "Dr.
Wyatt's opinion, [that] the claimant's IQ's were the result of a
combination of her depression and anxiety. However, the record
fails to show a level of anxiety or depression which would account
for such a low level of cognitive functioning." (Tr. at 13.) The
court can find absolutely no indication in Dr. Wyatt's report or
assessment that Claimant's low IQ test results were caused by her
other mental impairments. Dr. Wyatt made no such statement.
Instead, he made clear that Claimant's IQ scores were valid and
that Claimant is mildly mentally retarded based on her poor
academic skills and IQ scores. Furthermore, he reported that
testing on the WRAT-III placed Claimant on the third grade level
for reading. (Tr. at 198.) In addition, he noted that Claimant
had taken "a standardized achievement test administered by the
school system back in October, 1967. At that time she was found to
possess verbal skills in the lowest 6% of the population,
quantitative skills in the lowest five to 15% of the population,

18

and overall academic skills in the lowest 4% of the population."
(Tr. at 196.)

The ALJ never once mentions the results of standardized
testing from Claimant's school years or her poor grades in junior
high, nor does he consider their significance as opined by Dr.
Wyatt.  While the ALJ's statements that Claimant completed the
ninth grade and was never placed in special education classes or
had to repeat any grades (Tr. at 13) are factually correct, the ALJ
ignored other significant evidence of record from the time Claimant
was in school and prior to her twenty-second birthday, suggesting
that Claimant's level of functioning was more significantly
impaired.

In short, aside from Dr. Wyatt, no other medical source of
record administered IQ tests.  Moreover, Dr. Wyatt opined that
Claimant's scores on an IQ test administered by him were valid and
that Claimant was mildly mentally retarded.  In addition, Dr. Wyatt
made noteworthy findings related to Claimant's level of functioning
prior to age twenty-two based on standardized test results and
Claimant's grades in junior high.  Despite this evidence, the ALJ's
decision seems to sidestep the issue of whether Claimant met or
equaled Listing 12.05, and as such, the court must recommend
remand.

For the reasons set forth above, it is hereby respectfully
RECOMMENDED that the presiding District Judge GRANT the Plaintiff's

19

Motion for Summary Judgment to the extent she seeks remand and otherwise DENY Plaintiff's Motion, DENY the Defendant's Motion for Judgment on the Pleadings, REVERSE the final decision of the Commissioner, and REMAND this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable John T. Copenhaver, Jr.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.

20

1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to counsel of record.

_____May 23, 2006_____
            Date

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge

21